45 207
46 304
46 603

### No. 11,177.

#### SUCCESSION OF JUMONVILLE MORVANT.

The terms of the document presented for probate establish that the party intended to make a donation of the property not *inter vivos*, but *mortis causa.*

The will, olographic in form, was proven by two witnesses, who had seen the testator write and sign his name.

The other testimony supplements that of these two witnesses.

The declarations of the testator are admissible to prove that the document is in his handwriting, but not to prove his intentions.

APPEAL from the Eightenth District Court, Parish of Lafourche. Guion, Judge Twentieth Judicial District, sitting in place of Caillonet, J., recused.

*Thomas A. Badeaux* and *Arthur F. Knobloch* for Appellants.

*Beattie & Beattie* for Appellee.

The opinion of the court was delivered by

BREAUX, J.   The following document was presented to the District Court, to be probated, as the last will and testament of Jumonville Morvant:

"SEPTEMBER 14, 1878.

"Brother and Sister i Give my piec of Lands what i Bout from Miss. C. M. Gillis to Harriet Reese and Frank The boy what i Rase, and also my buggy and all my con and my oxsen and the Cart also dollar my mare and all what i got in the house.   i give all that To harriet Reese and Frank Longs they live Brother and Sister i give that to harriet Reese and Frank for they Life times so no law got any things to do with what i Give her and Frank i give it to her with all my heart She has been with me 24 year

"Well my Brother and Sister i sind my names on this piec papar for you all to see that i Right dis myself.

"J. MORVANT
"J. MORVANT

"J. F. MORVANT:

"Brother Joahin you will git my money that Mr. H. W. tabour got for me and you will give it to harriet Reese he gart 2 noat for me."

The heirs of the decedent, J. Morvant, oppose the probate of this document on the ground that it is null, for the reason that the intention of the party to make a will is not manifest; that the clauses it contains, and the manner in which it is made, doss not establish a testamentary disposition of the property.

In the second place it is urged that "the authenticity of the document was not proven by the declaration of two (2) credible persons, who must attest that they recognize the testament as being entirely written, dated and signed in the testator's handwriting, as having often seen him write during his lifetime; that proof by comparison

of handwriting is admissible only as supplementing the proof already adduced of two credible persons, who attest that they identify the signature and the handwriting of the testator; and lastly, that the evidence of declarations made by the decedent is inadmissible."

The document was probated by the District Court, and the will was ordered to be executed.

Objections to the document on other grounds than those before set forth were reserved.

From the judgment the legal heirs prosecute this appeal.

In reference to the first objection, that relating to

### THE INTENTION OF THE PARTY NOT BEING MANIFEST.

Upon that point, though always preferable that it should appear in express terms that the testator intended to donate *mortis causa*, the code upon the subject does not contain any sacramental words.

If the act of the testator and surrounding circumstances establish that it was intended as a testamentary disposition of the property, the will should be admitted to probate.

The testator was illiterate; ignorant of the rules of grammar and orthography; nevertheless the document expresses the disposition of the property he intended.

Justice requires that his will regarding his property should not be frustrated by rejecting the document as one which should not be admitted to probate, and without giving it full consideration after the probate.

"A disposition must be understood in the sense in which it can have effect, rather than that in which it has none." R. C. C. 1713.

It is obvious that the testator intended to dispose of his property by last will and testament.

The act bears no other interpretation. If it be attempted to give it any other, it at once becomes meaningless and an absurdity.

There is nothing in the manner the will was produced to be probated which creates the impression that an attempt was made to impose a document never intended as a will.

There being two persons designated as intended beneficiaries, one of whom had been with him twenty-four years, creates a strong presumption in favor of the intention.

The request made of his brother and sister, in the form of a notice, is not unsuggestive of a desire that they should not interfere.

14

He apprehended that the law would thwart his intention in the disposition he proposed to make, and he sought by the act and the notice to accomplish the object he had in view.

Having considered the questions more particularly of facts upon this point, we will take up and discuss the law applying. .

In the interpretation of acts of last will the intention of the testator must, if possible, be ascertained (C. C. 1712), and recourse must be had to all circumstances which may aid in the discovery of the intention.   C. C. 1715.

The case referred to by counsel for opponent does not strike us as conclusively applying.   Succession of Hampton Elliott, 27 An. 44.

In reference to the paper presented as testamentary the court held: "the intention of the party to make a will is not manifest and that there is no *corpus* upon which a will can operate."

"The notes referred to in the writing are not those involved in the suit."

The paper upon the face of the record contained a contradiction, and made it manifest that no property was designated.

This was decisive, and left nothing to indicate an intention of donating anything.

The French commentators and the courts are not entirely in accord in their discussion of the subject.

Coin Deslile, referred to by opponent's counsel, is as pronounced as any of the commentators against the validity of wills in which it does not appear, in express terms, as an integral part of the testament, that the disposition was *mortis causa*.   Even he says that the rule is not arbitrary, and that it is a question of interpretation which must be left to the courts to determine in each case.   Art. 970, Nos. 5 to 10, 336, 338.

More recently, and in conformity with more recent decisions, Aubry and Rau, Vol. 7, p. 97, say: "Le testateur n'est astreint à l'emploi d'aucune formule, ni d'aucuns termes sacramentels.   Anisi, il peut faire un legs, soit en termes imperatis, soit sous les formule d'une prière ou d'une simple recommendation."

On the same subject from Laurent: "We have elsewhere said that the word give is employed indifferently in matters of donation with *inter vivos* or *mortis causa*."   Vol. 13, p. 532.

From Demolombe, Vol. 21, p. 116, we translate: "The law has not subjected the manifestation of intention to any sacramental form; it

·devolves upon the courts to determine from the particular circum-
stances, such as the terms of the act, the nature of the dispositions,
ʇthe place where found," etc.

A number of decisions in point are referred to in Fuzier Hermann
Code Annoté, Vol. II, p. 637, No. 14 *et al.*:

The facts sustain the conclusion that the intention was to give,
ₑetc., not *inter vivos*, but *mortis causa*.

ʹThe other questions are not before us.

We only express our opinion in reference to the evident intention
·of the writer of the document.

### The Alleged Insuffiency of the Evidence to Admit the Will to Probate.

The olographic testament must be proven by the declaration of
ʇtwo credible persons, who, having seen the testator write and sign,
ʹrecognize the testament as being entirely written, dated and signed
by him.

The testimony of one of the witnesses, it is virtually conceded,
·conforms to the standard required.

He was well acquainted with the deceased, had seen him often
write.   He identified the document as the one the testator handed
to him to read in 1880 or 1881.

The first witness who testified says: "I should say that the signa-
ʇture is his, but it looks to me as if there were more mistakes in
·spelling, and the handwriting is more of an uneducated man."

Another witness, an intended beneficiary, testifies:

"From my knowledge of his handwriting from having seen him
write and sign, I think the signature to the document A is his, and
I think it is written, signed and dated by him."

An intended beneficiary under a will is a competent witness as to
ʇthe handwriting of the deceaꜱeᒎ, though he can not be a subscribing
ʹwitness.

The judge who tried the case was also a witness for the proponent;
he testifies that he was familiar with the handwriting of the dece-
·dent. He further states: "I would say that the letters ' B ' and ' C '
ₐare decidedly in his handwriting.  I am ꭇot so confident as to the
·document A, though there are words contained in it that are spelt
ₐas he was in the habit of spelling when he wrote to me."

Harriet Reese, a witness who can not read or write, says: that document A "looks like the one I handed to my attorney, Gov. Knobloch. Mr. Morvant handed me this document, and read to me and told me that it would protect me if I died after he did. I told him I thought it had to be signed in the court house, but he said it was not necessary."

The opponents have not introduced any evidence upon the subject.

The district judge probated the will upon this testimony.

The commentators upon the principles of evidence state that the proof of handwriting presents many difficulties and has in every age been found a source of embarrassment to legislators, jurists and practitioners. The difficulty does not arise when the handwriting of a certain document is proven by eye witnesses or by admissions of parties, but in cases where a judgment or opinion is that a given document is or is not in the handwriting of a given person. Best on Ev., p. 240.

There are three modes of proof laid down in logical order by Bentham, Vol. 3, Jud. Ev., p. 598:

1. *Præsumptio ex visu scriptionis.*
2. *Præsumptio ex scriptis olim visis.*
3. *Præsumptio ex comparatione scriptorum or ex scripto non viso.*

We are only concerned at this time with the first mode of proof—namely, that any person who has seen the writer write and has acquired a standard in his own mind of the general character of his handwriting is competent to testify as to his belief that the handwriting is genuine or not. Such testimony when credible and sufficient is not objectionable. The word "believe" does not weaken the force of the testimony. Bradford vs. Cooper, 1 An. 326; Jewell vs. Jewell, 1 R. 316. It must necessarily be a matter of judgment or opinion.

Actual knowledge extends a comparatively little way; men are compelled to resort to judgment—a species of circumstantial evidence not secondary to direct.

The evidence of the witnesses who testified from their knowledge acquired by having seen letters and other documents was admitted without objection. This evidence is within the second of the above rules. It was competent, and supplemented the evidence classed under the first mode of proof as to one witness, and as to the other witness from having communicated personally with the party upon the contents of the document.

The objections to testimony in reference to certain declarations of the testator, as recited in the bill of exceptions, are not maintained, for the reason that they are considered only in matter of proof of the handwriting, and not as evidence in matter of the intention of the testator, as set forth in this document admitted to probate.

Judgment affirmed at appellant's costs.